# Exhibit 4

## Belews Creek NPDES Permit No. NC0022406
## November 1, 2012

# STATE OF NORTH CAROLINA
# DEPARTMENT OF ENVIRONMENT AND NATURAL RESOURCES
# DIVISION OF WATER QUALITY

## PERMIT

## TO DISCHARGE WASTEWATER UNDER THE
## NATIONAL POLLUTANT DISCHARGE ELIMINATION SYSTEM

In compliance with the provision of North Carolina General Statute 143-215.1, other lawful standards and regulations promulgated and adopted by the North Carolina Environmental Management Commission, and the Federal Water Pollution Control Act, as amended,

## Duke Energy Corporation

is hereby authorized to discharge wastewater from a facility located at the

## Belews Creek Steam Station
## 3195 Pine Hall Road (NCSR 1908)
## Belews Creek
## Stokes County

to receiving waters designated as the West Belews Creek/Belews Lake (outfall 001) and the Dan River (outfall 003) in the Roanoke River Basin

in accordance with effluent limitations, monitoring requirements, and other conditions set forth in Parts I, II, III and IV hereof.

This permit shall become effective November 1, 2012.

This permit and authorization to discharge shall expire at midnight on **February 28, 2017.**

Signed this day October 12, 2012.

Original signed by Tom Belnick
_____
Charles Wakild P.E., Director
Division of Water Quality
By Authority of the Environmental Management Commission

1

## SUPPLEMENT TO PERMIT COVER SHEET

All previous NPDES Permits issued to this facility, whether for operation or discharge are hereby revoked. As of this permit issuance, any previously issued permit bearing this number is no longer effective. Therefore, the exclusive authority to operate and discharge from this facility arises under the permit conditions, requirements, terms, and provisions included herein.

### Duke Energy Corporation is hereby authorized to:

1. Continue to discharge:
   - Once through cooling water (outfall 001) consisting of intake screen backwash, recirculating cooling water, station equipment cooling water and once-through cooling water
   - Ash basin discharge (outfall 003) consisting of wastestreams from the power house and yard holding sumps, ash sluice lines, chemical holding pond, coal yard sumps, stormwater and remediated groundwater, and treated FGD wastewater from internal outfall 002 (Outfall 002 discharges to the ash pond)

   From a facility located at Belews Creek Station, 3195 Pine Hall Road (NCSR 1908), Belews Creek in Stokes County, and

2. Discharge wastewater from said treatment works at the location specified on the attached map into West Belews Creek/Belews Lake (outfall 001) and the Dan River (outfall 003), which are classified C and WS-IV waters, respectively, in the Roanoke River Basin.

## A. (1)   EFFLUENT LIMITATIONS AND MONITORING REQUIREMENTS (Outfall 001)

During the period beginning on the effective date of this permit and lasting until expiration, the Permittee is authorized to discharge once-through cooling water and intake screen backwash from outfall 001.  Such discharges shall be limited and monitored by the Permittee as specified below:

| PARAMETER | LIMITS | | MONITORING REQUIREMENTS | | |
|---|---|---|---|---|---|
| | Monthly Average | Daily Maximum | Measurement Frequency | Sample Type | Sample Location[1] |
| Flow | | | Continuous | Pump Logs | Effluent |
| Temperature ºC | | | Daily | Recorder/Grab | Upstream |
| Temperature ºC [2] | 32ºC | | Daily | Recorder/Grab | Downstream |
| Temperature ºC | | | Daily | Recorder/Grab | Effluent |

Notes:
1. Sampling locations: Upstream - Upstream at Southern Railroad crossing of Belews Creek OR East Belews Creek (site 405 or site 419), Downstream - Downstream at the discharge from the Dam, approximately 5.3 miles from the outfall.  Upstream temperature samples are to be measured one foot below the surface.
2. **In no case shall the ambient temperature exceed 32ºC as a result of Belews Creek Steam Station operations.**  The ambient temperature shall be defined as the daily average downstream discharge water temperature.  In cases where the Permittee experiences equipment problems and is unable to obtain daily temperatures from the existing temperature monitoring system, monitoring must be reestablished within five working days.

**Chlorination of the once through condenser cooling water and/or auxiliary cooling water, discharged through outfall 001, is not allowed under this permit.  Should Duke Energy wish to chlorinate its condenser cooling water, a permit modification must be requested and received prior to commencing chlorination.**

**There shall be no discharge of floating solids or visible foam in other than trace amounts**.

## A. (2)   EFFLUENT LIMITATIONS AND MONITORING REQUIREMENTS (Internal Outfall 002)

During the period beginning on the effective date of this permit and lasting until expiration, the Permittee is authorized to discharge from **Internal Outfall 002** (treated FGD wet scrubber wastewater to ash settling basin).  Such discharges shall be limited and monitored by the Permittee as specified below:

| PARAMETER | LIMITS | | MONITORING REQUIREMENTS | | |
|---|---|---|---|---|---|
| | Monthly Average | Daily Maximum | Measurement Frequency | Sample Type | Sample Location[1] |
| Flow | Monitor and Report | | Monthly | Pump Logs or similar readings | Effluent |
| Total Suspended solids | Monitor and Report | | Quarterly | Grab | Effluent |
| Total Arsenic | Monitor and Report | | Quarterly | Grab | Effluent |
| Chlorides | Monitor and Report | | Quarterly | Grab | Effluent |
| Total Mercury | Monitor and Report | | Quarterly | Grab | Effluent |
| Total Selenium | Monitor and Report | | Quarterly | Grab | Effluent |

Notes:
1. Effluent shall be defined as the discharge from the FGD wastewater treatment prior to discharge to the ash settling basin.

All flows shall be reported on monthly DMRs, should no flow occur during a given month,  the words "No Flow" shall be clearly written on the front of the DMR.  All samples shall be of a representative discharge.

**Sampling is only required when this outfall is discharging.**

3

## A. (3)   EFFLUENT LIMITATIONS AND MONITORING REQUIREMENTS (Outfall 003)

During the period beginning on the effective date of this permit and lasting until expiration, the Permittee is authorized to discharge from outfall 003 (ash settling pond) to the Dan River.  Such discharges shall be limited and monitored by the Permittee as specified below:

| PARAMETER | LIMITS | | MONITORING REQUIREMENTS | | |
|---|---|---|---|---|---|
| | Monthly Average | Daily Maximum | Measurement Frequency | Sample Type | Sample Location |
| Flow | | | Weekly | Pump logs or estimate | Effluent |
| Oil and Grease[1] | 15.0 mg/L | 20.0 mg/L | Quarterly[1] | Grab | Effluent |
| Total Suspended Solids[1] | 30.0 mg/L | 50.0 mg/L | Quarterly[1] | Grab | Effluent |
| Total Arsenic | | | Quarterly | Grab | Effluent |
| Chlorides | | | Quarterly | Grab | Effluent |
| Total Iron | | 1.0 mg/L | Quarterly | Grab | Effluent |
| Total Copper | | 1.0 mg/L | Quarterly | Grab | Effluent |
| Total Selenium | | | Quarterly | Grab | Effluent |
| Total Silver | | | Quarterly | Grab | Effluent |
| Fluoride | | | Quarterly | Grab | Effluent |
| Total Phosphorus | | | Quarterly | Grab | Effluent |
| Total Nitrogen ($NO_2 + NO_3 + TKN$) | | | Quarterly | Grab | Effluent |
| Sulfates[5] | 1,502.4 mg/L | 1,502.4 mg/L | Monthly | Grab | Effluent |
| Chronic Toxicity[2] | | | Quarterly | Grab | Effluent |
| pH[3] | | | 2/Month | Grab | Effluent |
| Bromides | | | Monthly | Grab | Effluent |
| Total Mercury[4] | | | Quarterly | Grab | Effluent |

Notes:
1. Quarterly monitoring for TSS, oil and grease and all toxicants shall be performed concurrently with the Chronic Toxicity test.
2. Whole Effluent Toxicity shall be monitored by chronic toxicity (Ceriodaphnia) P/F at 19%.  Tests shall be conducted in February, May, August and November (see Part A. (7.) for details).
3. The pH shall not be less than 6.0 standard units nor greater than 9.0 standard units and shall be monitored 2/month upstream of the confluence of the discharge and the receiving waters by grab sample.
4. The facility shall employ method 1631E.
5. After 12 months of monitoring, the facility can submit a request for a minor modification to remove the limit if the Reasonable Potential to exceed the water quality standard does not exist.

**The coal pile runoff and low volume wastes shall be discharged into the ash settling pond.**

**There shall be no discharge of floating solids or visible foam in other than trace amounts.**

## A. (4)  SPECIAL CONDITIONS

The following special conditions are applicable to Belews Creek Steam Station under NC0024406:

- There shall be no discharge of polychlorinated biphenyl compounds such as those commonly used for transformer fluid.
- **Outfall 006 -** The monitoring requirements for this internal discharge have been relocated to the actual discharge location (outfall 003) as of the February 1, 1998 NPDES permit.  This discharge must remain internal and discharge to the ash pond.  If discharge to the ash pond is relocated to surface waters of the state, then the monitoring requirements for this discharge will need to be reinstated via permit modification request.
- Continued intake screen backwash and non-contact cooling water are permitted without limitations or monitoring requirements.
- Nothing contained in this permit shall be construed as a waiver by the Permittee or any right to a hearing it may have pursuant to State or Federal laws or regulations.
- The term "low volume waste sources" means, taken collectively as if from one source, wastewater from all sources except those for which specific limitations are otherwise established in this part.  Low volume wastewater sources include, but are not limited to: wastewater from wet scrubber air pollution control systems, ion exchange water treatment system, water treatment evaporator blowdown, laboratory and sampling streams, boiler blowdown, floor drains, cooling tower basin cleaning wastes, and recirculating service water systems.  Sanitary and air conditioning wastes are not included.
- The term "chemical metal cleaning waste" means any wastewater resulting from cleaning any metal process equipment with chemical compounds, including, but not limited to, boiler tube cleaning.
- It has been determined from information submitted that the plans and procedures in place at Belews Creek Steam Station are equivalent to that of a BMP.
- Discharge of any product registered under the Federal Insecticide, Fungicide, and Rodenticide Act to any waste stream which may ultimately be released to lakes, rivers, streams or other wasters of the United States is prohibited unless specifically authorized elsewhere in this permit.  Discharge of chlorine from the use of chlorine gas, sodium hypochlorite, or other similar chlorination compounds for disinfection in the plant potable and service water systems and in sewage treatment is authorized.  Use of restricted use pesticides for lake management purposes by applicators licensed by the N.C. Pesticide Board is allowed.
- The Permittee shall report all visible discharges of floating materials, such as an oil sheen, to the Director when submitting DMRs
- If the Permittee, after monitoring for at least six months, determines that the facility is consistently meeting the effluent limits contained herein, the Permittee may request of the Director that the monitoring requirements be reduced to a lesser frequency.
- The Dan River Monitoring Plan, Phase III, as referred in the Engineering Report dated June 10, 1983 and submitted to DWQ, shall continue to be conducted.

Case 1:17-cv-01097-LCB-JLW   Document 1-4   Filed 12/05/17   Page 6 of 28

## A. (5)   BOILER CLEANING WASTES

It has been demonstrated that under certain conditions it is possible to reduce the concentration of metals in boiler cleaning wastes in the range of 92-99+ percent by treatment in ash ponds.  Because of dilution problems and the existence of boundary interface layers at the extremities of the plume, it is difficult to prove beyond doubt that the quantity of iron and copper discharge will always be less than one milligram per liter times the flow of metal cleaning when treated in this manner.

The application of physical/chemical methods of treating wastewater has also been demonstrated to be effective in the treatment of metal cleaning wastes.  However, the effectiveness of ash pond treatment should be considered in relation to the small differences in effluent quality realized between the two methods.

It has been demonstrated that the presence of ions of copper, iron, nickel and zinc in the ash pond waters was not measurably increased during the ash pond equivalency demonstration at the Duke Power Company's Belews Creek Steam Station.  Therefore, when the following conditions are implemented during metal cleaning procedures, effective treatment for metals can be obtained at this facility:
1.  Large ash basin providing potential reaction volumes in the ratio of 100 to 1.
2.  Well-defined shallow ash delta near the ash basin influent.
3.  Ash pond pHs of no less than 6.5 prior to metal cleaning waste addition.
4.  Four days retention time in ash pond with effluent stopped.
5.  Boiler volume less than 86,000 gallons.
6.  Chemicals for cleaning to include only one or more of the following:
    a.  Copper removal step- sodium bromate ($NaBrO_2$), ammonium carbonate (($NH_4$)$_2CO_3$-$H_2O$, and ammonium hydroxide ($NH_4OH$).
    b.  Iron removal step – hydrochloric acid ($HCl$), ammonium bifluoride (($NH_4$)$HF_2$ and proprietary inhibitors.
7.  Maximum dilution of wastewater before entering ash pond: 6 to 1.
8.  If monitoring of basin effluents (as required by the permit) after treatment of metal cleaning wastes reveals discharges exceed the limits of the permit, Permittee will:
    1)  re-close the basin discharge,
    2)  conduct such in-basin sampling as necessary to determine the cause of   nonconformance,
    3)  take appropriate corrective actions, and
    4)  file a report with EPA including all pertinent data.


## A. (6)   SPECIAL CONDITION FOR ASH POND DISCHARGE

Beginning on the effective date of this permit and lasting until expiration, there shall be no discharge of plant wastewater to the ash pond unless the Permittee provides and maintains at all times a minimum free water volume (between the top of the sediment level and the minimum discharge elevation) equivalent to the sum of the maximum 24-hour plant discharges plus all direct rainfall and all runoff flows to the pond resulting from a 10-year, 24-hour rainfall event, when using a runoff coefficient of 1.0.  During the term of the permit, the Permittee shall remove settled material from the ponds or otherwise enlarge the available storage capacities in order to maintain the required minimum volumes at all times.  The Permittee shall determine and report to the permit issuing authority the following on an annual basis:
1)  the actual free water volume of the ash pond,
2)  physical measurements of the dimensions of the free water volume in sufficient detail to allow validation of the calculated volume, and
3)  a certification that the required volume is available with adequate safety factor to include all solids expected to be deposited in the pond for the following year.
Present information indicates a needed volume of 86.2 acre-feet in addition to solids that will be deposited to the ash pond; any change to plant operations affecting such certification shall be reported to the Director within five days.

NOTE:  In the event that adequate volume has been certified to exist for the term of the permit, periodic certification is not needed.

## A. (7)   CHRONIC TOXICITY PASS/FAIL PERMIT LIMIT (QUARTERLY)

The effluent discharge shall at no time exhibit observable inhibition of reproduction or significant mortality to *Ceriodaphnia dubia* at an effluent concentration of **19.0%.**

The permit holder shall perform at a minimum, <u>*quarterly*</u> monitoring using test procedures outlined in the "North Carolina *Ceriodaphnia* Chronic Effluent Bioassay Procedure," Revised February 1998, or subsequent versions or "North Carolina Phase II Chronic Whole Effluent Toxicity Test Procedure" (Revised-February 1998) or subsequent versions. **The tests will be performed *during the months of* February, May, August and November.**  Effluent sampling for this testing shall be performed at the NPDES permitted final effluent discharge below all treatment processes.

**If the test procedure performed as the first test of any single quarter results in a failure or ChV below the permit limit, then multiple-concentration testing shall be performed at a minimum, in each of the two following months as described in "North Carolina Phase II Chronic Whole Effluent Toxicity Test Procedure" (Revised-February 1998) or subsequent versions.**

The chronic value for multiple concentration tests will be determined using the geometric mean of the highest concentration having no detectable impairment of reproduction or survival and the lowest concentration that does have a detectable impairment of reproduction or survival. The definition of "detectable impairment," collection methods, exposure regimes, and further statistical methods are specified in the "North Carolina Phase II Chronic Whole Effluent Toxicity Test Procedure" (Revised-February 1998) or subsequent versions.

All toxicity testing results required as part of this permit condition will be entered on the Effluent Discharge Monitoring Form (MR-1) for the months in which tests were performed, using the parameter code TGP3B for the pass/fail results and THP3B for the Chronic Value. Additionally, DWQ Form AT-3 (original) is to be sent to the following address:

> **Attention:    NC DENR / DWQ / Environmental Sciences Section**
> **1621 Mail Service Center**
> **Raleigh, North Carolina    27699-1621**

Completed Aquatic Toxicity Test Forms shall be filed with the Environmental Sciences Section no later than 30 days after the end of the reporting period for which the report is made.

Test data shall be complete, accurate, include all supporting chemical/physical measurements and all concentration/response data, and be certified by laboratory supervisor and ORC or approved designate signature. Total residual chlorine of the effluent toxicity sample must be measured and reported if chlorine is employed for disinfection of the waste stream.

Should there be no discharge of flow from the facility during a month in which toxicity monitoring is required, the permittee will complete the information located at the top of the aquatic toxicity (AT) test form indicating the facility name, permit number, pipe number, county, and the month/year of the report with the notation of "No Flow" in the comment area of the form. The report shall be submitted to the Environmental Sciences Section at the address cited above.

Should the permittee fail to monitor during a month in which toxicity monitoring is required, monitoring will be required during the following month.  Should any test data from this monitoring requirement or tests performed by the North Carolina Division of Water Quality indicate potential impacts to the receiving stream, this permit may be re-opened and modified to include alternate monitoring requirements or limits.

If the Permittee monitors any pollutant more frequently then required by this permit, the results of such monitoring shall be included in the calculation & reporting of the data submitted on the DMR & all AT Forms submitted.

NOTE:  Failure to achieve test conditions as specified in the cited document, such as minimum control organism survival, minimum control organism reproduction, and appropriate environmental controls, shall constitute an invalid test and will require immediate follow-up testing to be completed no later than the last day of the month following the month of the initial monitoring.

Case 1:17-cv-01097-LCB-JLW   Document 1-4   Filed 12/05/17   Page 8 of 28

## A. (8)   BIOCIDE CONDITION

The Permittee shall not use any biocides except those approved in conjunction with the permit application.  The Permittee shall notify the Director in writing not later than ninety (90) days prior to instituting use of any additional biocide used in cooling systems which may be toxic to aquatic life other than those previously reported to the Division of Water Quality.  Such notification shall include completion of Biocide Worksheet Form 101 and a map locating the discharge point and receiving stream.  Completion of Biocide Worksheet Form 101 is not necessary for those outfalls containing toxicity testing.  Division approval is not necessary for the introduction of a new biocide into an outfall currently being tested for toxicity.

## A. (9)   SECTION 316(b) REQUIREMENTS / Cooling Water Intake Structure (CWIS)

The facility shall continue to properly operate and maintain the CWIS.

## A. (10) GROUNDWATER MONITORING WELL CONSTRUCTION AND SAMPLING

The permittee shall conduct groundwater monitoring to determine the compliance of this NPDES permitted facility with the current groundwater Standards found under 15A NCAC 2L .0200. The monitoring shall be conducted in accordance with the Sampling Plan approved by the Division.

## A. (11) STRUCTURAL INTEGRITY INSPECTIONS OF ASH POND DAMS

The facility shall meet the dam design and dam safety requirements per 15A NCAC 2K.

## A. (12) FISH TISSUE MONITORING NEAR ASH POND DISCHARGE (Outfall 003)

The facility shall conduct fish tissue monitoring once during the permit term and submit the results with the NPDES permit renewal application. The objective of the monitoring is to evaluate potential uptake of pollutants by fish tissue near the Ash Pond discharge. The parameters analyzed in fish tissue shall be arsenic, selenium, and mercury. The monitoring shall be conducted in accordance with the Sampling Plan approved by the Division.

## A. (13) PUMPING FROM DAN RIVER INTO BELEWS LAKE

The Division recognizes the additional cooling water demand on Belews Lake associated with new scrubbers.  The operation of a permanent pump station and cooling water intake structure, receiving water pumped from the Dan River to Belews Lake, is hereby authorized under the following conditions:

- Pumping must not lower the flow in Dan River below 110 cfs, which is the Division of Water Resources target flow recommendation for this site.  River flow at the pumping location must be checked at a newly installed USGS gauge station near the old USGS Pine Hall gauge station prior to each daily pumping event.
- The Dan River pumps intake will be positioned above the river bottom and have an approach velocity less than or equal to 0.5 feet/second at the inlet of the velocity caps and at the 2mm fine mesh traveling screens to minimize fish entrainment and impingement.
- The withdrawal location will be near the confluence of the spillway channel below Belews Lake Dam and the Dan River.  This is a scoured bottom area that does not provide suitable aquatic habitat.
- The facility will perform routine semi-annual lake monitoring to assess limnological conditions in Belews Lake.
- Pumping may occur to a maximum water level in Belews Lake of 724.5 feet msl.
- Pumping must not occur from April 1 through June 30 of any year, in order to avoid the fish spawning period.

8

- At least 80% of ambient flow as recorded at the new Pine Hall USGS gauge must be bypassed (i.e., withdraw no more than 20% of flow).

This approval allows the operation of two 50 cfs velocity caps, a permanent settling pond with approximately 6000 square feet of surface area, a 4-pump pumping station with a capacity not to exceed 100 cfs, force main, an electrical substation with an access road, and a diffuser in Belews Lake.

Please note that this authorization does not affect the legal requirements to obtain other permits or approvals which may be required for this activity by the Division of Water Quality or other agencies, including the Division of Land Resources, the Division of Water Resources, or the US Army Corps of Engineers. The Division reserves the right to reopen this permit in the event of unforeseen negative environmental impacts due to this pumping operation.

## A. (14) BROMIDE REDUCTION EVALUATION

Duke Energy shall investigate technical solutions to reduce bromide in the discharge from Outfall 003. Duke Energy shall submit semi-annual reports on the efforts it undertakes to reduce bromide at the source as well as efforts at downstream water treatment plants to reduce formation of total trihalomethanes (TTHM). Duke Energy shall continue to work with the downstream public water supply systems to find a solution to the issue of the TTHM formation in the distribution system of the downstream water systems. The semi-annual status reports (3 copies) shall be submitted to the Division of Water Quality, Complex NPDES Permitting Unit.

In the event of a Maximum Contaminant Level (MCL) violation for Total Trihalomethanes (THMs) at the Town of Madison, the City of Eden or any wholesale customers of those systems, Duke Energy will within 14 days of the request provide the latest available bromide monitoring data that can be incorporated into required Public Notices issued by the public water system(s).

## A. (15) SECTION 316 (A) THERMAL VARIANCE

The thermal variance granted under Section 316(a) terminates on expiration of the NPDES permit. Should the permittee wish a continuation of its 316(a) thermal variance beyond the term of this permit, reapplication for such continuation shall be submitted in accordance with 40 CFR Part 125, Subpart H and Section 122.21(1)(6) not later than 180 days prior to permit expiration. Reapplication shall include a basis for continuation such as a) plant operating conditions and load factors are unchanged and are expected to remain so for the term of the reissued permit; b) there are no changes to plant discharges or other discharges in the plant site area which could interact with the thermal discharges; and c) there are no changes to the biotic community of the receiving waterbody which would impact the previous variance determination.

The next 316 (a) studies shall be performed in accordance with the Division of Water Quality approved plan. The temperature analysis and the balanced and indigenous study plan shall conform to the specifications outlined in 40 CFR 125 Subpart H and the EPA's Draft 316a Guidance Manual, dated 1977. The EPA shall be provided an opportunity to review the plan prior to the commencement of the study.

## A. (16) DOMESTIC WASTEWATER TREATMENT PLANT

The domestic wastewater treatment plant shall be properly operated and maintained to ensure treatment of domestic wastewater to secondary levels.

# PART II
## STANDARD CONDITIONS FOR NPDES PERMITS

### Section A.   Definitions

2/Month
Samples are collected twice per month with at least ten calendar days between sampling events. These samples shall be representative of the wastewater discharged during the sample period.

3/Week
Samples are collected three times per week on three separate calendar days. These samples shall be representative of the wastewater discharged during the sample period.

Act or "the Act"
The Federal Water Pollution Control Act, also known as the Clean Water Act (CWA), as amended, 33 USC 1251, et. seq.

Annual Average
The arithmetic mean of all "daily discharges" of a pollutant measured during the calendar year. In the case of fecal coliform, the geometric mean of such discharges.

Arithmetic Mean
The summation of the individual values divided by the number of individual values.

Bypass
The known diversion of waste streams from any portion of a treatment facility including the collection system, which is not a designed or established or operating mode for the facility.

Calendar Day
The period from midnight of one day until midnight of the next day. However, for purposes of this permit, any consecutive 24-hour period that reasonably represents the calendar day may be used for sampling.

Calendar Week
The period from Sunday through the following Saturday.

Calendar Quarter
One of the following distinct periods: January through March, April through June, July through September, and October through December.

Composite Sample
A sample collected over a 24-hour period by continuous sampling or combining grab samples of at least 100 mL in such a manner as to result in a total sample representative of the wastewater discharge during the sample period. The Director may designate the most appropriate method (specific number and size of aliquots necessary, the time interval between grab samples, etc.) on a case-by-case basis. Samples may be collected manually or automatically. Composite samples may be obtained by the following methods:

(1) Continuous: a single, continuous sample collected over a 24-hour period proportional to the rate of flow.

(2) Constant time/variable volume: a series of grab samples collected at equal time intervals over a 24 hour period of discharge and combined proportional to the rate of flow measured at the time of individual sample collection, or

(3) Variable time/constant volume: a series of grab samples of equal volume collected over a 24 hour period with the time intervals between samples determined by a preset number of gallons passing the sampling point. Flow measurement between sample intervals shall be determined by use of a flow recorder and totalizer, and the preset gallon interval between sample collection fixed at no greater than 1/24 of the expected total daily flow at the treatment system, or

(4) Constant time/constant volume: a series of grab samples of equal volume collected over a 24-hour period at a constant time interval. Use of this method requires prior approval by the Director. This method may only be used in situations where effluent flow rates vary less than 15 percent. The following restrictions also apply:

➢ Influent and effluent grab samples shall be of equal size and of no less than 100 milliliters

➢ Influent samples shall not be collected more than once per hour.

➢ Permittees with wastewater treatment systems whose detention time < 24 hours shall collect effluent grab samples at intervals of no greater than 20 minutes apart during any 24-hour period.

➢ Permittees with wastewater treatment systems whose detention time exceeds 24 hours shall collect effluent grab samples at least every six hours; there must be a minimum of four samples during a 24-hour sampling period.

<u>Continuous flow measurement</u>
Flow monitoring that occurs without interruption throughout the operating hours of the facility. Flow shall be monitored continually except for the infrequent times when there may be no flow or for infrequent maintenance activities on the flow device.

<u>Daily Discharge</u>
The discharge of a pollutant measured during a calendar day or any 24-hour period that reasonably represents the calendar day for purposes of sampling. For pollutants measured in units of mass, the "daily discharge" is calculated as the total mass of the pollutant discharged over the day. For pollutants expressed in other units of measurement, the "daily discharge" is calculated as the average measurement of the pollutant over the day. (40 CFR 122.2; see also "Composite Sample," above.)

<u>Daily Maximum</u>
The highest "daily discharge" during the calendar month.

<u>Daily Sampling</u>
Parameters requiring daily sampling shall be sampled 5 out of every 7 days per week unless otherwise specified in the permit. Sampling shall be conducted on weekdays except where holidays or other disruptions of normal operations prevent weekday sampling. If sampling is required for all seven days of the week for any permit parameter(s), that requirement will be so noted on the Effluent Limitations and Monitoring Page(s).

<u>DWR or "the Division"</u>
The Division of Water Resources, Department of Environment and Natural Resources.

<u>Effluent</u>
Wastewater discharged following all treatment processes from a water pollution control facility or other point source whether treated or untreated.

<u>EMC</u>
The North Carolina Environmental Management Commission

<u>EPA</u>
The United States Environmental Protection Agency

<u>Facility Closure</u>
Cessation of all activities that require coverage under this NPDES permit. Completion of facility closure will allow this permit to be rescinded.

<u>Geometric Mean</u>
The Nth root of the product of the individual values where N = the number of individual values. For purposes of calculating the geometric mean, values of "0" (or "< [detection level]") shall be considered = 1.

<u>Grab Sample</u>
Individual samples of at least 100 mL collected over a period of time not exceeding 15 minutes. Grab samples can be collected manually. Grab samples must be representative of the discharge (or the receiving stream, for instream samples).

Hazardous Substance
Any substance designated under 40 CFR Part 116 pursuant to Section 311 of the CWA.

Instantaneous flow measurement
The flow measured during the minimum time required for the flow measuring device or method to produce a result in that instance. To the extent practical, instantaneous flow measurements coincide with the collection of any grab samples required for the same sampling period so that together the samples and flow are representative of the discharge during that sampling period.

Monthly Average (concentration limit)
The arithmetic mean of all "daily discharges" of a pollutant measured during the calendar month. In the case of fecal coliform or other bacterial parameters or indicators, the geometric mean of such discharges.

Permit Issuing Authority
The Director of the Division of Water Resources.

Quarterly Average (concentration limit)
The arithmetic mean of all samples taken over a calendar quarter.

Severe property damage
Substantial physical damage to property, damage to the treatment facilities which causes them to become inoperable, or substantial and permanent loss of natural resources which can reasonably be expected to occur in the absence of a bypass. Severe property damage excludes economic loss caused by delays in production.

Toxic Pollutant:
Any pollutant listed as toxic under Section 307(a)(1) of the CWA.

Upset
An incident beyond the reasonable control of the Permittee causing unintentional and temporary noncompliance with permit effluent limitations and/or monitoring requirements. An upset does not include noncompliance caused by operational error, improperly designed treatment facilities, inadequate treatment facilities, lack of preventive maintenance, or careless or improper operation.

Weekly Average (concentration limit)
The arithmetic mean of all "daily discharges" of a pollutant measured during the calendar week. In the case of fecal coliform or other bacterial parameters or indicators, the geometric mean of such discharges.

## Section B.   General Conditions

1. **Duty to Comply**
   The Permittee must comply with all conditions of this permit. Any permit noncompliance constitutes a violation of the CWA and is grounds for enforcement action; for permit termination, revocation and reissuance, or modification; or denial of a permit renewal application [40 CFR 122.41].

   a. The Permittee shall comply with effluent standards or prohibitions established under section 307(a) of the CWA for toxic pollutants and with standards for sewage sludge use or disposal established under section 405(d) of the CWA within the time provided in the regulations that establish these standards or prohibitions or standards for sewage sludge use or disposal, even if the permit has not yet been modified to incorporate the requirement.

   b. The CWA provides that any person who violates section[s] 301, 302, 306, 307, 308, 318 or 405 of the Act, or any permit condition or limitation implementing any such sections in a permit issued under section 402, or any requirement imposed in a pretreatment program approved under sections 402(a)(3) or 402(b)(8) of the Act, is subject to a civil penalty not to exceed $37,500 per day for each violation. [33 USC 1319(d) and 40 CFR 122.41(a)(2)]

   c. The CWA provides that any person who negligently violates sections 301, 302, 306, 307, 308, 318, or 405 of the Act, or any condition or limitation implementing any of such sections in a permit issued under section 402 of the Act, or any requirement imposed in a pretreatment program approved under section 402(a)(3) or 402(b)(8) of the Act, is subject to criminal penalties of $2,500 to $25,000 per day of violation, or

imprisonment of not more than 1 year, or both. In the case of a second or subsequent conviction for a negligent violation, a person shall be subject to criminal penalties of not more than $50,000 per day of violation, or by imprisonment of not more than 2 years, or both. [33 USC 1319(c)(1) and 40 CFR 122.41(a)(2)]

d.  Any person who knowingly violates such sections, or such conditions or limitations is subject to criminal penalties of $5,000 to $50,000 per day of violation, or imprisonment for not more than 3 years, or both. In the case of a second or subsequent conviction for a knowing violation, a person shall be subject to criminal penalties of not more than $100,000 per day of violation, or imprisonment of not more than 6 years, or both. [33 USC 1319(c)(2) and 40 CFR 122.41(a)(2)]

e.  Any person who *knowingly* violates section 301, 302, 303, 306, 307, 308, 318 or 405 of the Act, or any permit condition or limitation implementing any of such sections in a permit issued under section 402 of the Act, and who knows at that time that he thereby places another person in imminent danger of death or serious bodily injury, shall, upon conviction, be subject to a fine of not more than $250,000 or imprisonment of not more than 15 years, or both. In the case of a second or subsequent conviction for a knowing endangerment violation, a person shall be subject to a fine of not more than $500,000 or by imprisonment of not more than 30 years, or both. An organization, as defined in section 309(c)(3)(B)(iii) of the CWA, shall, upon conviction of violating the imminent danger provision, be subject to a fine of not more than $1,000,000 and can be fined up to $2,000,000 for second or subsequent convictions. [40 CFR 122.41(a)(2)]

f.  Under state law, a civil penalty of not more than $25,000 per violation may be assessed against any person who violates or fails to act in accordance with the terms, conditions, or requirements of a permit. [North Carolina General Statutes § 143-215.6A]

g.  Any person may be assessed an administrative penalty by the Administrator for violating section 301, 302, 306, 307, 308, 318 or 405 of this Act, or any permit condition or limitation implementing any of such sections in a permit issued under section 402 of this Act. Administrative penalties for Class I violations are not to exceed $16,000 per violation, with the maximum amount of any Class I penalty assessed not to exceed $37,500. Penalties for Class II violations are not to exceed $16,000 per day for each day during which the violation continues, with the maximum amount of any Class II penalty not to exceed $177,500. [33 USC 1319(g)(2) and 40 CFR 122.41(a)(3)]

2.  Duty to Mitigate
    The Permittee shall take all reasonable steps to minimize or prevent any discharge or sludge use or disposal in violation of this permit with a reasonable likelihood of adversely affecting human health or the environment [40 CFR 122.41(d)].

3.  Civil and Criminal Liability
    Except as provided in permit conditions on "Bypassing" (Part II.C.4), "Upsets" (Part II.C.5) and "Power Failures" (Part II.C.7), nothing in this permit shall be construed to relieve the Permittee from any responsibilities, liabilities, or penalties for noncompliance pursuant to NCGS 143-215.3, 143-215.6 or Section 309 of the Federal Act, 33 USC 1319. Furthermore, the Permittee is responsible for consequential damages, such as fish kills, even though the responsibility for effective compliance may be temporarily suspended.

4.  Oil and Hazardous Substance Liability
    Nothing in this permit shall be construed to preclude the institution of any legal action or relieve the Permittee from any responsibilities, liabilities, or penalties to which the Permittee is or may be subject to under NCGS 143-215.75 et seq. or Section 311 of the Federal Act, 33 USG 1321. Furthermore, the Permittee is responsible for consequential damages, such as fish kills, even though the responsibility for effective compliance may be temporarily suspended.

5.  Property Rights
    The issuance of this permit does not convey any property rights in either real or personal property, or any exclusive privileges, nor does it authorize any injury to private property or any invasion of personal rights, nor any infringement of Federal, State or local laws or regulations [40 CFR 122.41(g)].

6.  Onshore or Offshore Construction
    This permit does not authorize or approve the construction of any onshore or offshore physical structures or facilities or the undertaking of any work in any navigable waters.

7. Severability

The provisions of this permit are severable. If any provision of this permit, or the application of any provision of this permit to any circumstances, is held invalid, the application of such provision to other circumstances, and the remainder of this permit, shall not be affected thereby [NCGS 150B-23].

8. Duty to Provide Information

The Permittee shall furnish to the Permit Issuing Authority, within a reasonable time, any information which the Permit Issuing Authority may request to determine whether cause exists for modifying, revoking and reissuing, or terminating this permit or to determine compliance with this permit. The Permittee shall also furnish to the Permit Issuing Authority upon request, copies of records required by this permit [40 CFR 122.41(h)].

9. Duty to Reapply

If the Permittee wishes to continue an activity regulated by this permit after the expiration date of this permit, the Permittee must apply for and obtain a new permit [40 CFR 122.41(b)].

10. Expiration of Permit

The Permittee is not authorized to discharge after the expiration date. In order to receive automatic authorization to discharge beyond the expiration date, the Permittee shall submit such information, forms, and fees as are required by the agency authorized to issue permits no later than 180 days prior to the expiration date unless permission for a later date has been granted by the Director. (The Director shall not grant permission for applications to be submitted later than the expiration date of the existing permit.) [40 CFR 122.21(d)] Any Permittee that has not requested renewal at least 180 days prior to expiration, or any Permittee that does not have a permit after the expiration and has not requested renewal at least 180 days prior to expiration, will subject the Permittee to enforcement procedures as provided in NCGS 143-215.6 and 33 USC 1251 et. seq.

11. Signatory Requirements

All applications, reports, or information submitted to the Permit Issuing Authority shall be signed and certified [40 CFR 122.41(k)].

a. All permit applications shall be signed as follows:

(1) For a corporation: by a responsible corporate officer. For the purpose of this Section, a responsible corporate officer means: (a) a president, secretary, treasurer or vice president of the corporation in charge of a principal business function, or any other person who performs similar policy or decision making functions for the corporation, or (b) the manager of one or more manufacturing, production, or operating facilities, provided, the manager is authorized to make management decisions which govern the operation of the regulated facility including having the explicit or implicit duty of making major capital investment recommendations, and initiating and directing other comprehensive measures to assure long term environmental compliance with environmental laws and regulations; the manager can ensure that the necessary systems are established or actions taken to gather complete and accurate information for permit application requirements; and where authority to sign documents has been assigned or delegated to the manager in accordance with corporate procedures .

(2) For a partnership or sole proprietorship: by a general partner or the proprietor, respectively; or

(3) For a municipality, State, Federal, or other public agency: by either a principal executive officer or ranking elected official [40 CFR 122.22].

b. All reports required by the permit and other information requested by the Permit Issuing Authority shall be signed by a person described in paragraph a. above or by a duly authorized representative of that person. A person is a duly authorized representative only if:

(1) The authorization is made in writing by a person described above;

(2) The authorization specified either an individual or a position having responsibility for the overall operation of the regulated facility or activity, such as the position of plant manager, operator of a well or well field, superintendent, a position of equivalent responsibility, or an individual or position having overall responsibility for environmental matters for the company. (A duly authorized representative may thus be either a named individual or any individual occupying a named position.); and

(3) The written authorization is submitted to the Permit Issuing Authority [40 CFR 122.22]

    c.   Changes to authorization: If an authorization under paragraph (b) of this section is no longer accurate because a different individual or position has responsibility for the overall operation of the facility, a new authorization satisfying the requirements of paragraph (b) of this section must be submitted to the Director prior to or together with any reports, information, or applications to be signed by an authorized representative [40 CFR 122.22]

    d.   Certification. Any person signing a document under paragraphs a. or b. of this section shall make the following certification [40 CFR 122.22]. NO OTHER STATEMENTS OF CERTIFICATION WILL BE ACCEPTED:

*"I certify, under penalty of law, that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fines and imprisonment for knowing violations."*

12.  Permit Actions
This permit may be modified, revoked and reissued, or terminated for cause. The filing of a request by the Permittee for a permit modification, revocation and reissuance, or termination, or a notification of planned changes or anticipated noncompliance does not stay any permit condition [40 CFR 122.41(f)].

13.  Permit Modification, Revocation and Reissuance, or Termination
The issuance of this permit does not prohibit the permit issuing authority from reopening and modifying the permit, revoking and reissuing the permit, or terminating the permit as allowed by the laws, rules, and regulations contained in Title 40, Code of Federal Regulations, Parts 122 and 123; Title 15A of the North Carolina Administrative Code, Subchapter 02H .0100; and North Carolina General Statute 143.215.1 et. al.

14.  Annual Administering and Compliance Monitoring Fee Requirements
The Permittee must pay the annual administering and compliance monitoring fee within thirty days after being billed by the Division. Failure to pay the fee in a timely manner in accordance with 15A NCAC 02H .0105(b)(2) may cause this Division to initiate action to revoke the permit.

## Section C.   Operation and Maintenance of Pollution Controls

1.  Certified Operator
Owners of classified water pollution control systems must designate operators, certified by the Water Pollution Control System Operators Certification Commission (WPCSOCC), of the appropriate type and grade for the system, and, for each classification must [T15A NCAC 08G .0201]:

    a.   designate one Operator In Responsible Charge (ORC) who possesses a valid certificate of the type and grade at least equivalent to the type and grade of the system;

    b.   designate one or more Back-up Operator(s) in Responsible Charge (Back-up ORCs) who possesses a valid certificate of the type of the system and no more than one grade less than the grade of the system, with the exception of no backup operator in responsible charge is required for systems whose minimum visitation requirements are twice per year; and

    c.   submit a signed completed "Water Pollution Control System Operator Designation Form" to the Commission (or to the local health department for owners of subsurface systems) countersigned by the designated certified operators, designating the Operator in Responsible Charge (ORC) and the Back-up Operator in Responsible Charge (Back-up ORC):

        (1)  60 calendar days prior to wastewater or residuals being introduced into a new system; or

        (2)  within 120 calendar days following:

            ➤   receiving notification of a change in the classification of the system requiring the designation of a new Operator in Responsible Charge (ORC) and Back-up Operator in Responsible Charge (Back-up ORC) of the proper type and grade; or

            ➤   a vacancy in the position of Operator in Responsible Charge (ORC) or Back-up Operator in Responsible Charge (Back-up ORC).

(3) within seven calendar days of vacancies in both ORC and Back-up ORC positions replacing or designating at least one of the responsibilities.

The ORC of each Class I facility (or the Back-up ORC, when acting as surrogate for the ORC) must:

➢ Visit the facility as often as is necessary to insure proper operation of the treatment system; the treatment facility must be visited at least weekly

➢ Comply with all other conditions of 15A NCAC 08G .0204.

The ORC of each Class II, III and IV facility (or the Back-up ORC, when acting as surrogate for the ORC) must:

➢ Visit the facility as often as is necessary to insure proper operation of the treatment system; the treatment facility must be visited at least five days per week, excluding holidays

➢ Properly manage and document daily operation and maintenance of the facility

➢ Comply with all other conditions of 15A NCAC 08G .0204.

2. <u>Proper Operation and Maintenance</u>
The Permittee shall at all times properly operate and maintain all facilities and systems of treatment and control (and related appurtenances) which are installed or used by the Permittee to achieve compliance with the conditions of this permit. Proper operation and maintenance also includes adequate laboratory controls and appropriate quality assurance procedures. This provision requires the Permittee to install and operate backup or auxiliary facilities only when necessary to achieve compliance with the conditions of the permit [40 CFR 122.41(e)].

NOTE: Properly and officially designated operators are fully responsible for all proper operation and maintenance of the facility, and all documentation required thereof, whether acting as a contract operator [subcontractor] or a member of the Permittee's staff.

3. <u>Need to Halt or Reduce not a Defense</u>
It shall not be a defense for a Permittee in an enforcement action that it would have been necessary to halt or reduce the permitted activity in order to maintain compliance with the condition of this permit [40 CFR 122.41(c)].

4. <u>Bypassing of Treatment Facilities</u>
   a. Bypass not exceeding limitations [40 CFR 122.41(m)(2)]

   The Permittee may allow any bypass to occur which does not cause effluent limitations to be exceeded, but only if it also is for essential maintenance to assure efficient operation. These bypasses are not subject to the provisions of Paragraphs b. and c. of this section.

   b. Notice [40 CFR 122.41(m)(3)]

   (1) Anticipated bypass. If the Permittee knows in advance of the need for a bypass, it shall submit prior notice, if possible at least ten days before the date of the bypass; including an evaluation of the anticipated quality and effect of the bypass.

   (2) Unanticipated bypass. The Permittee shall submit notice of an unanticipated bypass as required in Part II.E.6. (24-hour notice).

   c. Prohibition of Bypass

   (1) Bypass from the treatment facility is prohibited and the Permit Issuing Authority may take enforcement action against a Permittee for bypass, unless:

      (A) Bypass was unavoidable to prevent loss of life, personal injury or severe property damage;

      (B) There were no feasible alternatives to the bypass, such as the use of auxiliary treatment facilities, retention of untreated wastes or maintenance during normal periods of equipment downtime. This condition is not satisfied if adequate backup equipment should have been installed in the exercise of reasonable engineering judgment to prevent a bypass which occurred during normal periods of equipment downtime or preventive maintenance; and

      (C) The Permittee submitted notices as required under Paragraph b. of this section.

   (2) Bypass from the collection system is prohibited and the Permit Issuing Authority may take enforcement action against a Permittee for a bypass as provided in any current or future system-wide collection system permit associated with the treatment facility.

(3) The Permit Issuing Authority may approve an anticipated bypass, after considering its adverse effects, if the Permit Issuing Authority determines that it will meet the three conditions listed above in Paragraph c. (1) of this section.

5. Upsets

   a. Effect of an upset [40 CFR 122.41(n)(2)]: An upset constitutes an affirmative defense to an action brought for noncompliance with such technology based permit effluent limitations if the requirements of paragraph b. of this condition are met. No determination made during administrative review of claims that noncompliance was caused by upset, and before an action for noncompliance, is final administrative action subject to judicial review.

   b. Conditions necessary for a demonstration of upset: Any Permittee who wishes to establish the affirmative defense of upset shall demonstrate, through properly signed, contemporaneous operating logs, or other relevant evidence that:

   (1) An upset occurred and that the Permittee can identify the cause(s) of the upset;

   (2) The Permittee facility was at the time being properly operated; and

   (3) The Permittee submitted notice of the upset as required in Part II.E.6.(b) of this permit.

   (4) The Permittee complied with any remedial measures required under Part II.B.2. of this permit.

   c. Burden of proof [40 CFR 122.41(n)(4)]: The Permittee seeking to establish the occurrence of an upset has the burden of proof in any enforcement proceeding.

6. Removed Substances

   Solids, sludges, filter backwash, or other pollutants removed in the course of treatment or control of wastewaters shall be utilized/disposed of in accordance with NCGS 143-215.1 and in a manner such as to prevent any pollutant from such materials from entering waters of the State or navigable waters of the United States except as permitted by the Commission. The Permittee shall comply with all applicable state and Federal regulations governing the disposal of sewage sludge, including 40 CFR 503, Standards for the Use and Disposal of Sewage Sludge; 40 CFR Part 258, Criteria For Municipal Solid Waste Landfills; and 15A NCAC Subchapter 2T, Waste Not Discharged To Surface Waters. The Permittee shall notify the Permit Issuing Authority of any significant change in its sludge use or disposal practices.

7. Power Failures

   The Permittee is responsible for maintaining adequate safeguards (as required by 15A NCAC 02H .0124) to prevent the discharge of untreated or inadequately treated wastes during electrical power failures either by means of alternate power sources, standby generators or retention of inadequately treated effluent.

## Section D. Monitoring and Records

1. Representative Sampling

   Samples collected and measurements taken, as required herein, shall be representative of the permitted discharge. Samples collected at a frequency less than daily shall be taken on a day and time that is representative of the discharge for the period the sample represents. All samples shall be taken at the monitoring points specified in this permit and, unless otherwise specified, before the effluent joins or is diluted by any other wastestream, body of water, or substance. Monitoring points shall not be changed without notification to and the approval of the Permit Issuing Authority [40 CFR 122.41(j)].

2. Reporting

   Monitoring results obtained during the previous month(s) shall be summarized for each month and reported on a monthly Discharge Monitoring Report (DMR) Form (MR 1, 1.1, 2, 3) or alternative forms approved by the Director, postmarked no later than the last calendar day of the month following the completed reporting period.

   The first DMR is due on the last day of the month following the issuance of the permit or in the case of a new facility, on the last day of the month following the commencement of discharge. Duplicate signed copies of these, and all other reports required herein, shall be submitted to the following address:

NC DENR / Division of Water Resources / Water Quality Permitting Section
ATTENTION: Central Files
1617 Mail Service Center
Raleigh, North Carolina      27699-1617

3.  Flow Measurements
Appropriate flow measurement devices and methods consistent with accepted scientific practices shall be selected and used to ensure the accuracy and reliability of measurements of the volume of monitored discharges. The devices shall be installed, calibrated and maintained to ensure that the accuracy of the measurements is consistent with the accepted capability of that type of device. Devices selected shall be capable of measuring flows with a maximum deviation of less than 10% from the true discharge rates throughout the range of expected discharge volumes. Flow measurement devices shall be accurately calibrated at a minimum of once per year and maintained to ensure that the accuracy of the measurements is consistent with the accepted capability of that type of device. The Director shall approve the flow measurement device and monitoring location prior to installation.

Once-through condenser cooling water flow monitored by pump logs, or pump hour meters as specified in Part I of this permit and based on the manufacturer's pump curves shall not be subject to this requirement.

4.  Test Procedures
Laboratories used for sample analysis must be certified by the Division. Permittees should contact the Division's Laboratory Certification Section (919 733-3908 or http://portal.ncdenr.org/web/wq/lab/cert) for information regarding laboratory certifications.

Facilities whose personnel are conducting testing of field-certified parameters only must hold the appropriate field parameter laboratory certifications.

Test procedures for the analysis of pollutants shall conform to the EMC regulations (published pursuant to NCGS 143-215.63 et. seq.), the Water and Air Quality Reporting Acts, and to regulations published pursuant to Section 304(g), 33 USC 1314, of the CWA (as amended), and 40 CFR 136; or in the case of sludge use or disposal, approved under 40 CFR 136, unless otherwise specified in 40 CFR 503, unless other test procedures have been specified in this permit [40 CFR 122.41].

To meet the intent of the monitoring required by this permit, all test procedures must produce minimum detection and reporting levels that are below the permit discharge requirements and all data generated must be reported down to the minimum detection or lower reporting level of the procedure. If no approved methods are determined capable of achieving minimum detection and reporting levels below permit discharge requirements, then the most sensitive (method with the lowest possible detection and reporting level) approved method must be used.

5.  Penalties for Tampering
The CWA provides that any person who falsifies, tampers with, or knowingly renders inaccurate, any monitoring device or method required to be maintained under this permit shall, upon conviction, be punished by a fine of not more than $10,000 per violation, or by imprisonment for not more than two years per violation, or by both. If a conviction of a person is for a violation committed after a first conviction of such person under this paragraph, punishment is a fine of not more than $20,000 per day of violation, or by imprisonment of not more than 4 years, or both [40 CFR 122.41].

6.  Records Retention
Except for records of monitoring information required by this permit related to the Permittee's sewage sludge use and disposal activities, which shall be retained for a period of at least five years (or longer as required by 40 CFR 503), the Permittee shall retain records of all monitoring information, including:

> ➢ all calibration and maintenance records
> ➢ all original strip chart recordings for continuous monitoring instrumentation
> ➢ copies of all reports required by this permit
> ➢ copies of all data used to complete the application for this permit

These records or copies shall be maintained for a period of at least 3 years from the date of the sample, measurement, report or application. This period may be extended by request of the Director at any time [40 CFR 122.41].

7. Recording Results

For each measurement or sample taken pursuant to the requirements of this permit, the Permittee shall record the following information [40 CFR 122.41]:

    a. The date, exact place, and time of sampling or measurements;

    b. The individual(s) who performed the sampling or measurements;

    c. The date(s) analyses were performed;

    d. The individual(s) who performed the analyses;

    e. The analytical techniques or methods used; and

    f. The results of such analyses.

8. Inspection and Entry

The Permittee shall allow the Director, or an authorized representative (including an authorized contractor acting as a representative of the Director), upon the presentation of credentials and other documents as may be required by law, to;

    a. Enter, at reasonable times, upon the Permittee's premises where a regulated facility or activity is located or conducted, or where records must be kept under the conditions of this permit;

    b. Have access to and copy, at reasonable times, any records that must be kept under the conditions of this permit;

    c. Inspect at reasonable times any facilities, equipment (including monitoring and control equipment), practices, or operations regulated or required under this permit; and

    d. Sample or monitor at reasonable times, for the purposes of assuring permit compliance or as otherwise authorized by the CWA, any substances or parameters at any location [40 CFR 122.41(i)].

## Section E     Reporting Requirements

1. Change in Discharge

All discharges authorized herein shall be consistent with the terms and conditions of this permit. The discharge of any pollutant identified in this permit more frequently than or at a level in excess of that authorized shall constitute a violation of the permit.

2. Planned Changes

The Permittee shall give notice to the Director as soon as possible of any planned physical alterations or additions to the permitted facility [40 CFR 122.41(l)]. Notice is required only when:

    a. The alteration or addition to a permitted facility may meet one of the criteria for new sources at 40 CFR 122.29(b); or

    b. The alteration or addition could significantly change the nature or increase the quantity of pollutants discharged. This notification applies to pollutants subject neither to effluent limitations in the permit, nor to notification requirements under 40 CFR 122.42(a)(1); or

    c. The alteration or addition results in a significant change in the Permittee's sludge use or disposal practices, and such alteration, addition or change may justify the application of permit conditions that are different from or absent in the existing permit, including notification of additional use or disposal sites not reported during the permit application process or not reported pursuant to an approved land application plan.

3. Anticipated Noncompliance

The Permittee shall give advance notice to the Director of any planned changes to the permitted facility or other activities that might result in noncompliance with the permit [40 CFR 122.41(l)(2)].

4. Transfers

This permit is not transferable to any person without prior written notice to and approval from the Director in accordance with 40 CFR 122.61. The Director may condition approval in accordance with NCGS 143-215.1, in particular NCGS 143-215.1(b)(4)b.2., and may require modification or revocation and reissuance of the permit, or a minor modification, to identify the new permittee and incorporate such other requirements as may be necessary under the CWA [40 CFR 122.41(l)(3), 122.61] or state statute.

5. Monitoring Reports

Monitoring results shall be reported at the intervals specified elsewhere in this permit [40 CFR 122.41(l)(4)].

    a. Monitoring results must be reported on a Discharge Monitoring Report (DMR) (See Part II.D.2) or forms provided by the Director for reporting results of monitoring of sludge use or disposal practices.

    b. If the Permittee monitors any pollutant more frequently than required by this permit using test procedures approved under 40 CFR Part 136 and at a sampling location specified in this permit or other appropriate instrument governing the discharge, the results of such monitoring shall be included in the calculation and reporting of the data submitted on the DMR.

6. Twenty-four Hour Reporting

    a. The Permittee shall report to the Director or the appropriate Regional Office any noncompliance that potentially threatens public health or the environment. Any information shall be provided orally within 24 hours from the time the Permittee became aware of the circumstances. A written submission shall also be provided within 5 days of the time the Permittee becomes aware of the circumstances. The written submission shall contain a description of the noncompliance, and its cause; the period of noncompliance, including exact dates and times, and if the noncompliance has not been corrected, the anticipated time it is expected to continue; and steps taken or planned to reduce, eliminate, and prevent reoccurrence of the noncompliance [40 CFR 122.41(l)(6)].

    b. The Director may waive the written report on a case-by-case basis for reports under this section if the oral report has been received within 24 hours.

    c. Occurrences outside normal business hours may also be reported to the Division's Emergency Response personnel at (800) 662-7956, (800) 858-0368 or (919) 733-3300.

7. Other Noncompliance

The Permittee shall report all instances of noncompliance not reported under Part II.E.5 and 6. of this permit at the time monitoring reports are submitted. The reports shall contain the information listed in Part II.E.6. of this permit [40 CFR 122.41(l)(7)].

8. Other Information

Where the Permittee becomes aware that it failed to submit any relevant facts in a permit application, or submitted incorrect information in a permit application or in any report to the Director, it shall promptly submit such facts or information [40 CFR 122.41(l)(8)].

9. Noncompliance Notification

The Permittee shall report by telephone to either the central office or the appropriate regional office of the Division as soon as possible, but in no case more than 24 hours or on the next working day following the occurrence or first knowledge of the occurrence of any of the following:

    a. Any occurrence at the water pollution control facility which results in the discharge of significant amounts of wastes which are abnormal in quantity or characteristic, such as the dumping of the contents of a sludge digester; the known passage of a slug of hazardous substance through the facility; or any other unusual circumstances.

    b. Any process unit failure, due to known or unknown reasons, that render the facility incapable of adequate wastewater treatment such as mechanical or electrical failures of pumps, aerators, compressors, etc.

    c. Any failure of a pumping station, sewer line, or treatment facility resulting in a by-pass without treatment of all or any portion of the influent to such station or facility.

Persons reporting such occurrences by telephone shall also file a written report within 5 days following first knowledge of the occurrence. Also see reporting requirements for municipalities in Part IV.C.2.c. of this permit.

10. Availability of Reports

Except for data determined to be confidential under NCGS 143-215.3 (a)(2) or Section 308 of the Federal Act, 33 USC 1318, all reports prepared in accordance with the terms shall be available for public inspection at the offices of the Division. As required by the Act, effluent data shall not be considered confidential. Knowingly making any false statement on any such report may result in the imposition of criminal penalties as provided for in NCGS 143-215.1(b)(2) or in Section 309 of the Federal Act.

11. Penalties for Falsification of Reports

   The CWA provides that any person who knowingly makes any false statement, representation, or certification in any record or other document submitted or required to be maintained under this permit, including monitoring reports or reports of compliance or noncompliance shall, upon conviction, be punished by a fine of not more than $25,000 per violation, or by imprisonment for not more than two years per violation, or by both [40 CFR 122.41].

12. Annual Performance Reports

   Permittees who own or operate facilities that primarily collect or treat municipal or domestic wastewater and have an average annual flow greater than 200,000 gallons per day shall provide an annual report to the Permit Issuing Authority and to the users/customers served by the Permittee (NCGS 143-215.1C). The report shall summarize the performance of the collection or treatment system, as well as the extent to which the facility was compliant with applicable Federal or State laws, regulations and rules pertaining to water quality. The report shall be provided no later than sixty days after the end of the calendar or fiscal year, depending upon which annual period is used for evaluation.

   The report shall be sent to:

   > NC DENR / Division of Water Resources / Water Quality Permitting Section
   > ATTENTION: Central Files
   > 1617 Mail Service Center
   > Raleigh, North Carolina      27699-1617

# PART III
# OTHER REQUIREMENTS

## Section A.   Construction

a.  The Permittee shall not commence construction of wastewater treatment facilities, nor add to the plant's treatment capacity, nor change the treatment process(es) utilized at the treatment plant unless (1) the Division has issued an Authorization to Construct (AtC) permit or (2) the Permittee is exempted from such AtC permit requirements under Item b. of this Section.

b.  In accordance with NCGS 143-215.1(a5) [SL 2011-394], no permit shall be required to enter into a contract for the construction, installation, or alteration of any treatment work or disposal system or to construct, install, or alter any treatment works or disposal system within the State when the system's or work's principle function is to conduct, treat, equalize, neutralize, stabilize, recycle, or dispose of industrial waste or sewage from an industrial facility and the discharge of the industrial waste or sewage is authorized under a permit issued for the discharge of the industrial waste or sewage into the waters of the State.  Notwithstanding the above, the permit issued for the discharge may be modified if required by federal regulation.

c.  Issuance of an AtC will not occur until Final Plans and Specifications for the proposed construction have been submitted by the Permittee and approved by the Division.

## Section B.   Groundwater Monitoring

The Permittee shall, upon written notice from the Director, conduct groundwater monitoring as may be required to determine the compliance of this NPDES permitted facility with the current groundwater standards.

## Section C.   Changes in Discharges of Toxic Substances

The Permittee shall notify the Permit Issuing Authority as soon as it knows or has reason to believe (40 CFR 122.42):

a.  That any activity has occurred or will occur which would result in the discharge, on a routine or frequent basis, of any toxic pollutant which is not limited in the permit, if that discharge will exceed the highest of the following "notification levels";

   (1)  One hundred micrograms per liter (100 µg/L);

   (2)  Two hundred micrograms per liter (200 µg/L) for acrolein and acrylonitrile; five hundred micrograms per liter (500 µg/L) for 2,4-dinitrophenol and for 2-methyl-4,6-dinitrophenol; and one milligram per liter (1 mg/L) for antimony;

   (3)  Five times the maximum concentration value reported for that pollutant in the permit application.

b.  That any activity has occurred or will occur which would result in any discharge, on a non-routine or infrequent basis, of a toxic pollutant which is not limited in the permit, if that discharge will exceed the highest of the following "notification levels";

   (1)  Five hundred micrograms per liter (500 µg/L);

   (2)  One milligram per liter (1 mg/L) for antimony;

   (3)  Ten times the maximum concentration value reported for that pollutant in the permit application.

## Section D.   Facility Closure Requirements

The Permittee must notify the Division at least 90 days prior to the closure of any wastewater treatment system covered by this permit. The Division may require specific measures during deactivation of the system to prevent adverse impacts to waters of the State. This permit cannot be rescinded while any activities requiring this permit continue at the permitted facility.

# PART IV
## SPECIAL CONDITIONS FOR MUNICIPAL FACILITIES

### Section A.  Definitions

In addition to the definitions in Part II of this permit, the following definitions apply to municipal facilities:

Indirect Discharge or Industrial User
Any non-domestic source that discharges wastewater containing pollutants into a POTW regulated under section 307(b), (c) or (d) of the CWA. [40 CFR 403.3 (i) and (j) and 15A NCAC 02H .0903(b)(11)]

Interference
Inhibition or disruption of the POTW treatment processes; operations; or its sludge process, use, or disposal which causes or contributes to a violation of any requirement of the Permittee's (or any satellite POTW's if different from the Permittee) NPDES, collection system, or non-discharge permit or prevents sewage sludge use or disposal in compliance with specified applicable State and Federal statutes, regulations, or permits. [15A NCAC 02H .0903(b)(14)]

Pass Through
A discharge which exits the POTW into waters of the State in quantities or concentrations which, alone or with discharges from other sources, causes a violation, including an increase in the magnitude or duration of a violation, of the Permittee's (or any satellite POTW's, if different from the Permittee) NPDES, collection system, or non-discharge permit. [15A NCAC 02H .0903(b)(23)]

Publicly Owned Treatment Works (POTW)
A treatment works as defined by Section 212 of the CWA, which is owned by a State or local government organization. This definition includes any devices and systems used in the storage, treatment, recycling and reclamation of municipal sewage or industrial wastes of a liquid nature. It also includes the collection system, as defined in 15A NCAC 2T .0402, only if it conveys wastewater to a POTW treatment plant. The term also means the local government organization, or municipality, as defined in section 502(4) of the CWA, which has jurisdiction over indirect discharges to and the discharges from such a treatment works. In this context, the organization may be the owner of the POTW treatment plant or the owner of the collection system into which an indirect discharger discharges. This second type of POTW may be referred to as a "satellite POTW organization." [15A NCAC 02H .0903(b)(26)]

"Significant Industrial User" or "SIU"
An Industrial User that discharges wastewater into a publicly owned treatment works and that [15A NCAC 02H .0903(b)(33)]:

1. Discharges an average of 25,000 gallons per day or more of process wastewater to the POTW (excluding sanitary, noncontact cooling and boiler blowdown wastewaters); or
2. Contributes process wastewater which makes up five percent or more of the NPDES or non-discharge permitted flow limit or organic capacity of the POTW treatment plant. In this context, organic capacity refers to BOD, TSS and ammonia; or
3. Is subject to categorical standards under 40 CFR Part 403.6 and 40 CFR Parts 405-471; or
4. Is designated as such by the Permittee on the basis that the Industrial User has a reasonable potential for adversely affecting the POTW's operation or for violating any pretreatment standard or requirement, or the POTW's effluent limitations and conditions in its NPDES or non-discharge permit, or to limit the POTW's sludge disposal options; or
5. Subject to approval under 15A NCAC 02H .0907(b), the Permittee may determine that an Industrial User meeting the criteria in paragraphs 1 or 2 of this definition above has no reasonable potential for adversely affecting the POTW's operation or for violating any pretreatment standard or requirement, the POTW's effluent limitations and conditions in its NPDES or non-discharge permit, or to limit the POTW's sludge disposal options, and thus is not a Significant Industrial User (SIU); or
6. Subject to approval under 15A NCAC 02H .0907(b), the Permittee may determine that an Industrial User meeting the criteria in paragraph 3 of this definition above meets the requirements of 40 CFR Part 403.3(v)(2) and thus is a non-significant categorical Industrial User.

### Section B.  Publicly Owned Treatment Works (POTWs)

All POTWs must provide adequate notice to the Director of the following [40 CFR 122.42(b)]:

1.  Any new introduction of pollutants into the POTW from an indirect discharger, regardless of the means of transport, which would be subject to section 301 or 306 of CWA if it were directly discharging those pollutants; and

2.  Any substantial change in the volume or character of pollutants being introduced by an indirect discharger as influent to that POTW at the time of issuance of the permit.

3.  For purposes of this paragraph, adequate notice shall include information on (1) the quality and quantity of effluent introduced into the POTW, and (2) any anticipated impact that may result from the change of the quantity or quality of effluent to be discharged from the POTW.

### Section C.   Municipal Control of Pollutants from Industrial Users.

1.  Effluent limitations are listed in Part I of this permit. Other pollutants attributable to inputs from Industrial Users discharging to the POTW may be present in the Permittee's discharge. At such time as sufficient information becomes available to establish limitations for such pollutants, this permit may be revised to specify effluent limitations for any or all of such other pollutants in accordance with best practicable technology or water quality standards.

2.  Prohibited Discharges

    a.  The Permittee shall develop and enforce their Pretreatment Program to implement the prohibition against the introduction of pollutants or discharges into the waste treatment system or waste collection system which cause or contribute to Pass Through or Interference as defined in 15A NCAC 02H .0900 and 40 CFR 403. [40 CFR 403.5(a)(1)]

    b.  The Permittee shall develop and enforce their Pretreatment Program  to implement the prohibitions  against the introduction of the following wastes in the waste treatment or waste collection system [40 CFR 403.5(b)]:

        (1)  Pollutants which create a fire or explosion hazard in the POTW, including, but not limited to, wastestreams with a closed cup flashpoint of less than 140 degrees Fahrenheit or 60 degrees Centigrade using the test methods specified in 40 CFR 261.21;

        (2)  Pollutants which cause corrosive structural damage to the POTW, but in no case discharges with pH lower than 5.0, unless the works is specifically designed to accommodate such discharges;

        (3)  Solid or viscous pollutants in amounts which cause obstruction to the flow in the POTW resulting in Interference;

        (4)  Any pollutant, including oxygen demanding pollutants (BOD, etc.) released in a Discharge at a flow rate and/or pollutant concentration which will cause Interference with the POTW;

        (5)  Heat in amounts which will inhibit biological activity in the POTW resulting in Interference, but in no case heat in such quantities that the temperature at the POTW Treatment Plant exceeds 40°C (104°F) unless the Division, upon request of the POTW, approves alternate temperature limits;

        (6)  Petroleum oil, non-biodegradable cutting oil, or products of mineral oil origin in amounts that will cause Interference or Pass Through;

        (7)  Pollutants which result in the presence of toxic gases, vapors, or fumes within the POTW in a quantity that may cause acute worker health and safety problems; or

        (8)  Any trucked or hauled pollutants, except at discharge points designated by the POTW.

    c.  The Permittee shall investigate the source of all discharges into the POTW, including slug loads and other unusual discharges, which have the potential to adversely impact the Permittee's Pretreatment Program and/or the operation of the POTW.

        The Permittee shall report such discharges into the POTW to the Director or the appropriate Regional Office. Any information shall be provided orally within 24 hours from the time the Permittee became aware of the circumstances. A written submission shall also be provided within 5 days of the time the Permittee becomes aware of the circumstances. The written submission shall contain a description of the discharge; the investigation into possible sources; the period of the discharge, including exact dates and times; if the discharge has not ceased, the anticipated time it is expected to continue; and steps taken or planned to reduce, eliminate, and prevent reoccurrence of the noncompliance,

3. With regard to the effluent requirements listed in Part I of this permit, it may be necessary for the Permittee to supplement the requirements of the Federal Pretreatment Standards (40 CFR, Part 403) to ensure compliance by the Permittee with all applicable effluent limitations. Such actions by the Permittee may be necessary regarding some or all of the industries discharging to the municipal system.

4. The Permittee shall require any Industrial User (IU) discharging to the POTW to meet Federal Pretreatment Standards developed under Section 307(b) of the Act as amended (which includes categorical standards and specific local limits, best management practices and narrative requirements). Prior to accepting wastewater from any Significant Industrial User (SIU), the Permittee shall either develop and submit to the Division a new Pretreatment Program or, as necessary, a modification of an existing Pretreatment Program, for approval as required under section D below as well as 15A NCAC 02H .0907(a) and (b). [40 CFR 122.44(j)(2)]

5. This permit shall be modified, or alternatively, revoked and reissued, to incorporate or modify an approved POTW Pretreatment Program or to include a compliance schedule for the development of a POTW Pretreatment Program as required under Section 402 (b)(8) of the CWA and implementing regulations or by the requirements of the approved State pretreatment program, as appropriate.

## Section D.  Pretreatment Programs

Under authority of sections 307 (b) and (c) and 402(b)(8) of the CWA and implementing regulations 40 CFR 403, North Carolina General Statute 143-215.3(14) and implementing regulations 15A NCAC 02H .0900, and in accordance with the approved pretreatment program, all provisions and regulations contained and referenced in the pretreatment program submittal are an enforceable part of this permit. [40 CFR 122.44(j)(2)]

The Permittee shall operate its approved pretreatment program in accordance with Section 402(b)(8) of the CWA, 40 CFR 403, 15A NCAC 02H .0900, and the legal authorities, policies, procedures, and financial provisions contained in its pretreatment program submission and Division approved modifications thereof. Such operation shall include but is not limited to the implementation of the following conditions and requirements. Terms not defined in Part II or Part IV of this permit are as defined in 15A NCAC 02H .0903 and 40 CFR 403.3.

1. Sewer Use Ordinance (SUO)
   The Permittee shall maintain adequate legal authority to implement its approved pretreatment program. [15A NCAC 02H .0903(b)(32), .0905 and .0906(b)(1); 40 CFR 403.8(f)(1) and 403.9(b)(1) and (2)]

2. Industrial Waste Survey (IWS)
   The Permittee shall implement an IWS consisting of the survey of users of the POTW collection system or treatment plant, as required by 40 CFR 403.8(f)(2)(i-iii) and 15A NCAC 02H .0905 [also 40 CFR 122.44(j)(1)], including identification of all Industrial Users that may have an impact on the POTW and the character and amount of pollutants contributed to the POTW by these Industrial Users and identification of those Industrial Users meeting the definition of SIU. Where the Permittee accepts wastewater from one or more satellite POTWs, the IWS for the Permittee shall address all satellite POTW services areas, unless the pretreatment program in those satellite service areas is administered by a separate Permittee with an approved Pretreatment Program. The Permittee shall submit a summary of its IWS activities to the Division at least once every five years, and as required by the Division. The IWS submission shall include a summary of any investigations conducted under paragraph C.2.c. of this Part. [15A NCAC 02H .0903(b)(13), .0905 and .0906(b)(2); 40 CFR 403.8(f)(2) and 403.9]

3. Monitoring Plan
   The Permittee shall implement a Division-approved Monitoring Plan for the collection of facility specific data to be used in a wastewater treatment plant Headworks Analysis (HWA) for the development of specific pretreatment local limits. Effluent data from the Plan shall be reported on the DMRs (as required by Parts II.D and II.E.5.). [15A NCAC 02H .0903(b)(16), .0906(b)(3) and .0905]

4. Headworks Analysis (HWA) and Local Limits
   The Permittee shall obtain Division approval of a HWA at least once every five years, and as required by the Division. Within 180 days of the effective date of this permit (or any subsequent permit modification) the Permittee shall submit to the Division a written technical evaluation of the need to revise local limits (i.e., an updated HWA or documentation of why one is not needed) [40 CFR 122.44]. The Permittee shall develop, in accordance with 40 CFR 403.5(c) and 15A NCAC 02H .0909, specific Local Limits to implement the prohibitions listed in 40 CFR 403.5(a) and (b) and 15A NCAC 02H .0909. Pursuant to 40 CFR 403.5, local limits are

enforceable Pretreatment Standards as defined by 40 CFR 403.3(1). [15A NCAC 02H .0903(b)(10), .0905, and .0906(b)(4)]

5. <u>Industrial User Pretreatment Permits (IUP) & Allocation Tables</u>
   In accordance with NCGS 143-215.1, the Permittee shall issue to all Significant Industrial Users, permits for operation of pretreatment equipment and discharge to the Permittee's collection system or treatment works. These permits shall contain limitations, sampling protocols, reporting requirements, appropriate standard and special conditions, and compliance schedules as necessary for the installation of treatment and control technologies to assure that their wastewater discharge will meet all applicable pretreatment standards and requirements. The Permittee shall maintain a current Allocation Table (AT) which summarizes the results of the HWA and the limits from all IUPs. Permitted IUP loadings for each parameter cannot exceed the treatment capacity of the POTW as determined by the HWA. [15A NCAC 02H .0906(b)(6), .0909, .0916, and .0917; 40 CFR 403.5, 403.8(f)(1)(iii); NCGS 143-215.67(a)]

6. <u>Authorization to Construct (AtC)</u>
   The Permittee shall ensure that an Authorization to Construct permit (AtC) is issued to all applicable Industrial Users for the construction or modification of any pretreatment facility. Prior to the issuance of an AtC, the proposed pretreatment facility and treatment process must be evaluated for its capacity to comply with all Industrial User Pretreatment Permit (IUP) limitations. [15A NCAC 02H .0906(b)(7) and .0905; NCGS 143-215.1a(8)]

7. <u>POTW Inspection & Monitoring of their IUs</u>
   The Permittee shall conduct inspection, surveillance, and monitoring activities as described in its Division approved pretreatment program in order to determine, independent of information supplied by Industrial Users, compliance with applicable pretreatment standards. [15A NCAC 02H .0908(e); 40 CFR 403.8(f)(2)(v)]  The Permittee must:

   a.  Inspect all Significant Industrial Users (SIUs) at least once per calendar year;

   b.  Sample all Significant Industrial Users (SIUs) at least once per calendar year for all SIU permit-limited parameters including flow except as allowed under 15A NCAC .0908(e); and

   c.  At least once per year, document an evaluation of any non-significant categorical Industrial User for compliance with the requirements in 40 CFR 403.3(v)(2), and either continue or revoke the designation as non-significant.

8. <u>IU Self Monitoring and Reporting</u>
   The Permittee shall require all Industrial Users to comply with the applicable monitoring and reporting requirements outlined in the Division-approved pretreatment program, the industry's pretreatment permit, or in 15A NCAC 02H .0908. [15A NCAC 02H .0906(b)(5) and .0905; 40 CFR 403.8(f)(1)(v) and (2)(iii); 40 CFR 122.44(j)(2) and 40 CFR 403.12]

9. <u>Enforcement Response Plan (ERP)</u>
   The Permittee shall enforce and obtain appropriate remedies for violations of all pretreatment standards promulgated pursuant to section 307(b) and (c) of the CWA (40 CFR 405 et. seq.), prohibitive discharge standards as set forth in 40 CFR 403.5 and 15A NCAC 02H .0909, specific local limitations, and other pretreatment requirements. All remedies, enforcement actions and other, shall be consistent with the Enforcement Response Plan (ERP) approved by the Division. [15A NCAC 02H .0903(b)(7), .0906(b)(8) and .0905; 40 CFR 403.8(f)(5)]

10. <u>Pretreatment Annual Reports (PAR)</u>
    The Permittee shall report to the Division in accordance with 15A NCAC 02H .0908. In lieu of submitting annual reports, Modified Pretreatment Programs developed under 15A NCAC 02H .0904 (b) may be required to submit a partial annual report or to meet with Division personnel periodically to discuss enforcement of pretreatment requirements and other pretreatment implementation issues.

    For all other active pretreatment programs, the Permittee shall submit two copies of a Pretreatment Annual Report (PAR) describing its pretreatment activities over the previous calendar year to the Division at the following address:

NC DENR / Division of Water Resources / Water Quality Permitting Section
Pretreatment, Emergency Response, and Collection Systems (PERCS) Unit
1617 Mail Service Center
Raleigh, North Carolina    27699-1617

These reports shall be submitted by March 1 of each year and shall contain the following:

a. Narrative
A narrative summary  detailing actions taken, or proposed, by the Permittee to correct significant non-compliance and to ensure compliance with pretreatment requirements;

b. Pretreatment Program Summary (PPS)
A pretreatment program summary (PPS) on forms or in a format provided by the Division;

c. Significant Non-Compliance Report (SNCR)
A list of Industrial Users (IUs) in significant noncompliance (SNC) with pretreatment requirements, and the nature of the violations on forms or in a format provided by the Division;

d. Industrial Data Summary Forms (IDSF)
Monitoring data from samples collected by both the POTW and the Significant Industrial Users (SIUs). These analytical results must be reported on Industrial Data Summary Forms (IDSF) or on other forms or in a format provided by the Division;

e. Other Information
Copies of the POTW's allocation table, new or modified enforcement compliance schedules, public notice of IUs in SNC, a summary of data or other information related to significant noncompliance determinations for IUs that are not considered SIUs, and any other information, upon request, which in the opinion of the Director is needed to determine compliance with the pretreatment implementation requirements of this permit;

11. Public Notice
The Permittee shall publish annually a list of Industrial Users (IUs) that were in significant noncompliance (SNC) as defined in the Permittee's Division-approved Sewer Use Ordinance with applicable pretreatment requirements and standards during the previous twelve month period. This list shall be published within four months of the applicable twelve-month period. [15A NCAC 02H .0903(b)(34), .0908(b)(5) and .0905 and 40 CFR 403.8(f)(2)(viii)]

12. Record Keeping
The Permittee shall retain for a minimum of three years records of monitoring activities and results, along with support information including general records, water quality records, and records of industrial impact on the POTW and shall retain all other Pretreatment Program records as required by 15A NCAC 02H .0908(f). [15A NCAC 02H .0908(f); 40 CFR 403.12(o)]

13. Pretreatment Program Resources
The Permittee shall maintain adequate funding and qualified personnel to accomplish the objectives of its approved pretreatment program. and retain a written description of those current levels of inspection. [15A NCAC 02H .0906(b)(9) and (10) and .0905; 40 CFR 403.8(f)(3), 403.9(b)(3)]

14. Modification to Pretreatment Programs
Modifications to the approved pretreatment program including but not limited to local limits modifications, POTW monitoring of their Significant Industrial Users (SIUs), and Monitoring Plan modifications, shall be considered a permit modification and shall be governed by 40 CFR 403.18, 15 NCAC 02H .0114 and 15A NCAC 02H .0907.